JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Keely Charles, as Personal Representative of the Estate of Sterling Lester Chest

**(b)** County of Residence of First Listed Plaintiff   Hampden
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jennifer L. CAVA-FOREMAN
Christopher F. Cava, Esquire   (413)737-3430
2 Mattoon Street, Springfield, MA 01105

## DEFENDANTS

City of Springfield               , Joseph Beliveau,
Lindsay Tagliapietra, Luis Delgado and Kristopher Carr

County of Residence of First Listed Defendant   Hampden
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:     IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC section 1983
Brief description of cause:
excessive use of force by police resulting in death

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE  3/23/2023

SIGNATURE OF ATTORNEY OF RECORD

---

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

---

**KEELY CHARLES, as Personal Representative**
**Of the Estate of STERLING LESTER CHEST,**

<table>
<tr><td>Plaintiff</td><td>Civil Action No. _____</td></tr>
</table>

**Vs**

**CITY OF SPRINGFIELD,**
**JOSEPH BELIVEAU,**
**LINDSAY TAGLIAPIETRA,**
**LUIS DELGADO and**
**KRISTOPHER CARR**
                    **Defendants**

---

## **COMPLAINT and JURY DEMAND**

## **PARTIES**

1.      KEELY CHARLES, of 6 Rosemont Street, Springfield, Hampden County,

Massachusetts, is a natural person and the sister of Sterling Lester Chest.  Ms. Charles was

appointed Personal Representative of the Estate of Sterling Lester Chest.  The Estate was formed

under the laws of Massachusetts by order of the Hampden County Probate Court.

2.      The Defendant, CITY OF SPRINGFIELD ("the City") is a municipal entity with a

principal place of doing business at 36 Court Street, Springfield, Hampden County,

Massachusetts.  At all times relevant to the Complaint, the City maintained and operated the City

of Springfield Police Department located at 130 Pearl Street, Springfield, Hampden County, Massachusetts.

3.      Defendant, JOSEPH BELIVEAU, was at all relevant times hereto, an officer in the City of Springfield Police Department.  His actions alleged in this Complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Springfield.  He is being sued in his official and individual capacity.

4.      Defendant, LINDSAY TAGLIAPIETRA, was at all relevant times hereto, an officer in the City of Springfield Police Department.  Her actions alleged in this Complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Springfield.  She is being sued in her official and individual capacity.

5.      Defendant, LUIS DELGADO, was at all relevant times hereto, an officer in the City of Springfield Police Department.  His actions alleged in this Complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Springfield.  He is being sued in his official and individual capacity.

6.      Defendant, KRISTOPHER CARR, was at all relevant times hereto, an officer in the City of Springfield Police Department.  His actions alleged in this Complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Springfield.  He is being sued in his official and individual capacity.

7.      Defendants, JOSEPH BELIVEAU, LINDSAY TAGLIAPIETRA, LUIS DELGADO AND KRISTOPHER CARR, are referred to collectively herein as "Defendant Officers".

## JURISDICTION

8.      The Court has jurisdiction over this action pursuant to 42 U.S.C. §1983, which gives the district court jurisdiction over all civil actions arising from violations of rights guaranteed by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §1343 which gives the district court jurisdiction over all civil actions arising under the Constitution, laws and treaties of the United States.  This court also has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. §1367.  Venue is proper under 28 U.S.C. §1391(b).

## STATEMENT OF FACTS

9.      On or about March 30, 2020, Mr. Sterling Lester Chest, a large black man, not known to have a criminal record, (hereinafter referred to as "Mr. Chest"), was experiencing an episode of paranoia.

10.      As a result of same, Mr. Chest's girlfriend's mother, Margarita Torres, concerned for his well-being, called the Springfield Police Department, which resulted in the Defendant Officers arriving at a vehicle in which Mr. Chest was a passenger in her daughter, Jessica Reyes, Nissan Rogue vehicle.

11.      Dispatch report on March 30, 2020 at 4:59 pm indicated caller's daughter's boyfriend, Sterling Chest, had gone crazy, was  yelling about the bible and running through traffic, described as a large black male wearing a white T-shirt.

12.      Office Delgado, at 5:06 pm, was able to locate Mr. Chest at the intersection of Locust Street and Dickinson Street, Springfield, Massachusetts, inside the Nissan Rogue with his girlfriend, Jessica Reyes.

13.     Based on the original police dispatch, it was clear that Mr. Chest had mental health issues, which was the reason for the Defendant Officers appearing on the scene.

14.     When the Defendant Officers arrived on the scene at approximately 5:06 pm, Mr. Chest was seated in the passenger seat of the vehicle and spoke to the Officers through his open window.  Jessica Reyes was seated in the driver's seat.  The vehicle was parked near the intersection of Dickinson and Locust Streets.

15.     At 5:08 pm, a police dispatch indicated that a Section 12 form (Admission of an individual to a psychiatric hospital) was issued for Mr. Chest and the agency was in route to his location at Dickinson and Locust Streets.  (See G.L. c. 123 §12).

16.     Upon exiting the vehicle, Mr. Chest was patted down by the Officers and then stood talking to them with his hands on his head.  Mr. Chest spoke to the officers and stated, "I looked too far into the bible".  Officers observed Mr. Chest seemed confused and was not making any sense.  Mr. Chest then approached each officer individually and asked them to give themselves to the Lord.

17.     Upon request, Officer Tagliapietra retrieved Mr. Chest's bottle (gallon) of water from the vehicle, and Mr. Chest subsequently shook her hand.

18.     Approximately seven (7) minutes after arriving on the scene, the Officers allowed Mr. Chest to return to his vehicle.  While in the vehicle, Mr. Chest yelled "take me to jail."  Officer Beliveau replied, "we are not here to take you to jail."

19.     Jessica Reyes indicated that she did not know why the police were there as she never called the Springfield Police.  She further indicated that the officers were agitating Mr. Chest who was yelling to them through the window and rolled the window up to calm Mr. Chest down.

The officers insisted that the window remain down and this continued exchange, and an officer grabbing the door handle of the car triggered Mr. Chest to exit the car.

20.     Mr. Chest exited the vehicle and appeared to have words with the Defendant Officers and pushed Officer Beliveau in the chest.

21.     At 5:17 pm, Officer Beliveau drew and deployed his Department issued taser on Mr. Chest, several times, causing Mr. Chest to fall to the ground just nine (9) minutes after he had notice of the Section 12 which is a violation of the "Springfield Police Department General Order on Electronic Control Weapons" policy.  (See Policy attached hereto as Exhibit "A").

22.     Thereafter, the Defendant Officers rolled Mr. Chest onto his stomach and handcuffed him and dragged Mr. Chest to the rear of one of the Springfield Police cruisers on the scene.

23.     Mr. Chest was brought to the police cruiser at which time he aggressively struck his head three (3) times on the glass window of the cruiser.

24.     In attempting to have Mr. Chest enter the back seat of the police cruiser, his pants fell down to his ankles.

25.     Officer Tagliapietra and Officer McNabb entered the police cruiser from the driver side and used their batons to pull Mr. Chest into the cruiser while Officers Beliveau and Delgado pushed Mr. Chest from the passenger side.

26.     Ms. Reyes stated that the officer tazed Mr. Chest twice, and one of the officers beat him with a baton on the legs and they handcuffed him.  She further stated the officers hit Mr. Chest in the legs with their batons to get him into the cruiser.

27.     When the use of the batons, and the aggressive pushing/pulling by the Defendant Officers, failed to put Mr. Chest in the cruiser, the Defendant, Kristopher Carr, took a few steps backwards and then ran forward kneeing Mr. Chest in the abdomen/groin area.

28.     Even after Mr. Chest had been tazed numerous times, struck his head on the glass window (multiple times) and was kneed in the abdomen/groin and an ambulance arrived on the scene, no medical personnel examined Mr. Chest, nor did any of the Defendant Officers examine him or offer any medical attention.

29.     It was not until approximately eighteen (18) minutes after the initial tasing that the Defendant Officers proceeded to take Mr. Chest to Baystate Medical Center in Springfield, Massachusetts.

30.     During the altercation, Mr. Chest sustained an injury to his left elbow and was taken to Baystate Medical Center where he was admitted and diagnosed as sustaining  a left triceps tendon avulsion.

31.     At no time did the Defendant Officers notify medical personnel at the hospital that Mr. Chest had been tazed multiple times, nor did they disclose the amount and duration of electric shock delivered to Mr. Chest's body.  Mr. Chest was subsequently discharged with no cardiac workup.

32.     On the morning of April 3, 2020, Mr. Chest presented to Baystate Medical Center complaining of shortness of breath and chest pain.

33.     Mr. Chest was referred for emergency angiography, however, within minutes of hospital staff obtaining arterial access, Mr. Chest, who was only 45 years old, died.

34.    Mr. Chest was a chronic drug user as evidenced by the Postmortem Toxicology Report serum blood results which indicated positive findings of Delta-9 Carboxy THC 16 and Delta-9 THC of greater than 50 ng/ml.  (See Medical Examiner's Report incorporated herein and available through Court Order of Presiding Judge per 505 CMR 1.04).

35.    Defendant, Officer Beliveau filed a Taser Use Reporting Form indicating one (1) taser firing, however in his report to the Commissioner, he admits to firing his taser twice.  Mr. Chest's body had eight (8) scars as evidence of use of Electronic Control Weapons. (8 pairs of scars with puncture wounds 1 cm apart)

36.    According to the Springfield Police Department General Order on Electronic Control Weapons (ECW) Defendant Officers were responsible for seeking medical attention for:

       a.    A person who requests medical attention;

       b.    A person who does not appear to recover properly after being engaged with the electronic device;

       c.    A person who is in a potentially susceptible population category ((d)) "those known to be suffering from severe mental illness;

       d.    A person who has been energized more than three times;

       e.    A person who has been subjected to a continuous energy cycle of fifteen (15) seconds or more; and

       f.    A person who has exhibited signs of extreme uncontrolled agitation or hyperactivity prior to electronic control weapon exposure.  (See Exhibit "A").

37.    Defendant Officers failed to follow the ECW policy knowing that at 5:08 pm a Section 12 was issued for admission to Psychiatric Hospital.

38.     Defendant Officers further failed to follow the "Officers Responsibilities" which states that "The deploying officer shall notify his or her supervisor as soon as possible after deploying the device and shall complete the designated ECW form." "Officers shall specifically articulate in their use-of force report, any instance of the following:

      a.     An electronic control weapon is energized more than three times on a single subject;

      b.     An energy cycle longer than fifteen (15) second in duration is used against a subject;

      c.     More than one electronic weapon is used against a subject in any given incident; and

      d.     An electronic control weapon is used against an individual designated to be in a "susceptible population" ((d) "those known to be suffering from severe mental illness. (See Exhibit "A").

39.     The ECW form submitted by Defendant, Beliveau, indicates that Mr. Chest was struck once in the abdomen and the hand.

40.     According to the Chief Medical Examiner, Christopher Perry, MD, the cause of Mr. Chest's death was: "Cardiac tamponade due to ruptured myocardial infarction following physical altercation with police including electromechanical shock and restraints for the management of an acute psychotic episode." (See Death Certificate attached hereto as Exhibit "B").

41.     Clearly, based on all of the above findings, the Defendant Officers failed to notify and disclose to their superiors, or medical personnel, their excessive use of force, restraints and electricity.

## COUNT I v. DEFENDANT, JOSEPH BELIVEAU

### Unreasonable Seizure – Excessive Force in Violation of 42 U.S.C. §1983

42.     The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-41 and incorporates same by reference herein.

43.     At all times relevant to this Complaint, the Defendant, Joseph Beliveau, was acting under the color of law in his capacity as a Springfield Police Officer.

44.     The Defendant, Joseph Beliveau's unjustified use of force on Mr. Chest deprived him of his right to be secure in his person against unreasonable searches and seizures and due process as guaranteed to him by the Fourth Amendment of the United States Constitution.

45.     As a result of the Defendant, Joseph Beliveau's conduct, Mr. Chest suffered emotional distress, injury, anxiety and death.

46.     The conduct of the Defendant, Joseph Beliveau was willful, wanton, malicious and done with reckless disregard for the rights and safety of Mr. Chest and therefore warrants the imposition of punitive damages.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant, Joseph Beliveau, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT II v. DEFENDANT, LINDSAY TAGLIAPIETRA

### Unreasonable Seizure – Excessive Force in Violation of 42 U.S.C. §1983

47.     The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-46 and incorporates same by reference herein.

48.     At all times relevant to this Complaint, the Defendant, Lindsay Tagliapietra, was acting under the color of law in her capacity as a Springfield Police Officer.

49.     The Defendant, Lindsay Tagliapietra's unjustified use of force on Mr. Chest deprived him of his right to be secure in his person against unreasonable and due process as guaranteed to him by the Fourth Amendment of the United States Constitution.

50.     As a result of the Defendant, Lindsay Tagliapietra's conduct, Mr. Chest suffered emotional distress, injury, anxiety and death.

51.     The conduct of the Defendant, Lindsay Tagliapietra was willful, wanton, malicious and done with reckless disregard for the rights and safety of Mr. Chest and therefore warrants the imposition of punitive damages.

        WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant, Lindsay Tagliapietra, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT III v. DEFENDANT, LUIS DELGADO

### Unreasonable Seizure – Excessive Force in Violation of 42 U.S.C. §1983

52.     The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-51 and incorporates same by reference herein.

53.     At all times relevant to this Complaint, the Defendant, Luis Delgado, was acting under the color of law in his capacity as a Springfield Police Officer.

54.     The Defendant, Luis Delgado's unjustified use of force on Mr. Chest deprived him of his right to be secure in his person against unreasonable searches and seizures and due process as guaranteed to him by the Fourth Amendment of the United States Constitution.

55.     As a result of the Defendant, Luis Delgado's conduct, Mr. Chest suffered emotional distress, injury, anxiety and death.

56.     The conduct of the Defendant, Luis Delgado was willful, wanton, malicious and done with reckless disregard for the rights and safety of Mr. Chest and therefore warrants the imposition of punitive damages.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant, Luis Delgado, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT IV v. DEFENDANT, KRISTOPHER CARR

### Unreasonable Seizure – Excessive Force in Violation of 42 U.S.C. §1983

57.     The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-56 and incorporates same by reference herein.

58.     At all times relevant to this Complaint, the Defendant, Kristopher Carr, was acting under the color of law in his capacity as a Springfield Police Officer.

59.     The Defendant, Kristopher Carr's unjustified use of force on Mr. Chest deprived him of his right to be secure in his person against unreasonable searches and seizures and due process as guaranteed to him by the Fourth Amendment of the United States Constitution.

60.    As a result of the Defendant, Kristopher Carr's conduct, Mr. Chest suffered emotional distress, injury, anxiety and death.

61.    The conduct of the Defendant, Kristopher Carr was willful, wanton, malicious and done with reckless disregard for the rights and safety of Mr. Chest and therefore warrants the imposition of punitive damages.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant, Kristopher Carr, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT V v. DEFENDANT OFFICERS

### Violation of Taser Policies

62.    The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-61 and incorporate same by reference herein.

63.    According to the Springfield Police Department General Order on Electronic Control Weapons (ECW) Defendant Officers were responsible for seeking medical attention for:

a.    A person who requests medical attention;

b.    A person who does not appear to recover properly after being engaged with the electronic device;

c.    A person who is in a potentially susceptible population category ((d)) "those known to be suffering from severe mental illness;

d.    A person who has been energized more than three times;

e.      A person who has been subjected to a continuous energy cycle of fifteen (15) seconds or more; and

f.      A person who has exhibited signs of extreme uncontrolled agitation or hyperactivity prior to electronic control weapon exposure.  (See Exhibit "A").

64.    Defendant Officers failed to examine, evaluate and/or treat Mr. Chest and did not permit responding ambulance personnel to examine, evaluate and/or treat Mr. Chest despite the fact he had been tazed, struck his head multiple times and was kneed in the abdomen/groin area.

65.    Defendant Officers failed to follow the ECW policy knowing that at 5:08 pm a Section 12 was issued for admission to Psychiatric Hospital.

66.    Defendant Officers further failed to follow the "Officers Responsibilities" which states that "The deploying officer shall notify his or her supervisor as soon as possible after deploying the device and shall complete the designated ECW form." "Officers shall specifically articulate in their use-of force report, any instance of the following:

a.      An electronic control weapon is energized more than three times on a single subject;

b.      An energy cycle longer than fifteen (15) second in duration is used against a subject;

c.      More than one electronic weapon is used against a subject in any given incident; and

d.      An electronic control weapon is used against an individual designated to be in a "susceptible population" ((d)) "those known to be suffering from severe mental illness.  (See Exhibit "A").

67.     The ECW form submitted by Defendant, Beliveau, indicates that Mr. Chest was struck once in the abdomen and the hand.  In a subsequent report to the Commissioner, he admits to firing his taser twice. Mr. Chest's body had eight (8) scars as evidence of use of Electronic Control Weapons.  (8 pairs of scars with puncture wounds 1 cm apart)

68.     According to the Chief Medical Examiner, Christopher Perry, MD,  the cause of Mr. Chest's death was: "Cardiac tamponade due to ruptured myocardial infarction following physical altercation with police including electromechanical shock and restraints for the management of an acute psychotic episode."  (See Exhibit "B").

69.     At 5:08 pm, a police dispatch indicated that a Section 12 form (Admission of an individual to a psychiatric hospital) was issued for Mr. Chest and the agency was in route to his location at Dickinson and Locust Streets.

70.     At 5:17 pm, Officer Beliveau deployed his taser due to subject being combative.

71.     Clearly, based on all of the above findings, the Defendant Officers failed to notify and disclose to their superiors, and medical personnel, their excessive use of force, restraints and electricity.

        WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant Officers, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT VI v. DEFENDANT CITY

### Municipal Liability

72.    The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-71 and incorporates same by reference herein.

73.    On and for some time prior to March 30, 2020, the Defendant City deprived Mr. Chest of the rights and liberties secured to him by the United States Constitution, in that the Defendant City and its supervising and managerial employees, agents and representatives, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Mr. Chest by knowingly maintaining, enforcing and applying an official recognized custom, policy and practice of:

a.    Employing and retaining police Officers whom the Defendant City knew or should have known had dangerous propensities for abusing their authority and for mistreating citizens by failing to follow written police department policies;

b.    Inadequately supervising, training, controlling, assigning, and discipling police Officers, and other personnel, who the Defendant City, knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

c.    By failing to adequately train and supervise Officers and failing to institute appropriate policies, regarding the use of excessive force;

d.    By having and maintaining an unconstitutional policy, custom, and practice of using excessive force, which also is demonstrated by inadequate training regarding these subjects. The policies, customs, and practices of the Defendant City, were done with deliberate indifference to individuals' safety and rights; and

e.      Inadequately training the Defendant City's police Officers.

74.     As a result of the aforementioned inadequate customs and policies of the Defendant City,

the Plaintiff's decedent, Mr. Chest, suffered emotional distress, injury, anxiety and death.

75.     The Defendant City is liable to the Plaintiff for compensatory damages.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester

Chest, demands judgment against the Defendant, City, in such amount as this Court shall deem

just and proper together with interest and costs.

## COUNT VII v. ALL DEFENDANTS

**Unconstitutional Failure to Provide Medical Care, Treatment and
Monitoring in Violation of Fourteenth Amendment's Right to Due Process
(42 U.S.C. §1983)**

76.     The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-75 and

incorporates same by reference herein.

77.     Defendant Officers, Tagliapietra, Beliveau and Carr are persons within the meaning of 42

U.S.C. §1983.

78.     On March 30, 2020, Sterling Chest was held in custody by the Defendant Officers and

City subject to the custody and control of the Defendant Officers.

79.     On March 30, 2020, Defendant Officers were aware of Mr. Chest's medical needs and

deliberately and unreasonably failed to seek a medical evaluation, obtain outside medical

treatment or provide him with medical care themselves.  This failure was pursuant to the

policies, practices and customs of the City, including but not limited to its written rules and

procedures and its failure to train, supervise, investigate and discipline its Officers.

80.    Defendants' refusal to seek a medical evaluation, refusal to disclose the amount and duration of electric shock delivered to Mr. Chest's body to medical providers and refusal to obtain outside medical treatment or provide Mr. Chest with medical care themselves, led to his ultimate death.

81.    Defendants' actions and inactions, deprived Mr. Chest of his rights, privileges or immunities secured by the U.S. Constitution and laws, including his clearly established due process rights under the Fourteenth Amendment to the U.S. Constitution in violation of 42 U.S.C. §1983.

82.    Defendants' actions were taken with reckless disregard for Mr. Chest's constitutional rights.

83.    As a result of Defendants' actions and inactions, Mr. Chest and his next of kin lost his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice.  Mr. Chest died because of the Defendants' actions and inactions.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendants, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT VIII v. DEFENDANT CITY

### Violation of Title II of the Americans with Disabilities Act (ADA)

84.    The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-83 and incorporates same by reference herein.

85.     Defendant, City is a public entity subject to the ADA (American Disabilities Act)

86.     On March 30, 2020, Mr. Chest weighed approximately 444 pounds and had a body mass index (BMI) of 55.5 Kilograms. Mr. Chest was also suffering a psychotic episode.

87.     A BMI of 18.5-25.0 is considered healthy and a BMI of 30.0 or higher is considered obese.  Individuals with a BMI of 40.0 or higher are usually categorized as "extremely" or "severely" obese.  (Center for Disease Control and Prevention). The American Medical Association recognizes obesity as a disease.

88.     An individual has a disability if he or she has a physical or mental impairment that substantially limits one or more of his major life activities.

89.     Clearly, Mr. Chest's size and his erratic and paranoic behavior would indicate to the Defendants a physical and/or mental impairment.

90.     Mr. Chest was subject to the custody and control of the City's employees.  Throughout his time in the Defendants' custody, Mr. Chest was a qualified person with a disability, including because he had a physical or mental impairment that substantially limited one or more major life activities and because the City regarded him as having a mental or physical impairment within the meaning of the ADA.

91.     Defendant intentionally and unreasonably discriminated against Mr. Chest on account of his disability, by failing to implement policies and train its Officers in methods that would have provided Mr. Chest with an adequate medical evaluation, monitoring, care and treatment.

92.     Defendant Officers intentionally and unreasonably discriminated against Mr. Chest on account of his disability by failing to obtain an adequate medical evaluation, seek outside

medical treatment or provide medical care themselves despite his clear signs of urgent medical distress.

93.     Because of his disability, the City and Defendant Officers intentionally discriminated against Mr. Chest, failed to provide him with adequate treatment for his medical conditions, deprived him of the benefits of a medical program and were objectively unreasonable towards, and deliberately indifferent to his serious medical needs.

94.     Defendant, City's unlawful discrimination against Mr. Chest caused his ultimate death.

95.     Separately, Defendant City is vicariously liable for the Defendant Officers' unlawful discrimination against Mr. Chest.

96.     As a result of Defendant, City's actions and inactions, Mr. Chest and his next of kin lost his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice.  Mr. Chest died because of the Defendants' actions and inactions.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant, City, in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT IX v. DEFENDANT OFFICERS

### False Imprisonment (Common Law)

97.     The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-96 and incorporates same by reference herein.

98.     The Defendant Officers, acting under color of law, intentionally and unlawfully confined Mr. Chest against his will.

99.     The Plaintiff was conscious of said unconsented to confinement, deprived of his liberty, and suffered physical and emotional harm and subsequent death has a direct result.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendant Officers in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT X v. DEFENDANTS

### Abuse of Process (Common Law)

100.    The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-99 and incorporates same by reference herein.

101.    The Defendants initiated criminal proceedings against Mr. Chest.

102.    The Defendants initiated said criminal process for an ulterior and/or illegitimate purpose, to wit: (1) to cover up their unlawful detention and imprisonment of Mr. Chest and their use of excessive and unreasonable force in carrying out said detention and imprisonment; (2) to protect themselves from criminal and civil liability for their illegal actions; and (3) to frustrate Mr. Chest for pursuing legal remedies available to him.

103.    As a direct result of the Defendants' actions, the Plaintiff was deprived of his liberty and suffered physical and emotional harm and subsequent death.

104.    Mr. Chest's estate is therefore entitled to damages under Massachusetts common law.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendants in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT XI v. DEFENDANT OFFICERS

### Wrongful Death (M.G.L. c. 229 §2)

105.    The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-104 and incorporates same by reference herein.

106.    Defendant Officers caused Mr. Chest's death by intentional acts.

107.    Mr. Chest's next of kin, by and through his Estate, is entitled to compensation for the loss of his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, demands judgment against the Defendants in such amount as this Court shall deem just and proper together with interest and costs.

## COUNT XII v. DEFENDANTS

### Racial Bias

108.    The Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-107 and incorporates same by reference herein.

109.    Defendants engaged in intentional and/or unintentional racial bias against Mr. Chest, subjecting him to discrimination practices which resulted in their using excessive force on Mr. Chest which subsequently caused his death.

110.    Mr. Chest's next of kin, by and through his Estate, is entitled to compensation for the loss of his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice.

WHEREFORE, the Plaintiff, as Personal Representative of the Estate of Sterling Lester Chest, requests that this Court enter judgment against the Defendants, jointly and severally on all Counts of this Complaint, and where appropriate:

a.      Award compensatory damages;

b.      Award punitive damages;

c.      Award interest and costs of this action to the Plaintiff;

d.      Award attorney's fees to the Plaintiff; and

e.      Award such other relief as this Court may deem just and proper.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

For the Plaintiff,
By Her Attorneys,

Christopher F. Cava, Esquire, BBO#: 554437
Jennifer L. Cava-Foreman, Esquire, BBO#: 682014
CAVA LAW FIRM
Two Mattoon Street
Springfield, MA 01105
Phone: (413) 737-3430/Fax: (413) 737-3382
Email: chris@cavalawfirm.com
        jennifer@cavalawfirm.com

Dated: March 23, 2023

# EXHIBIT A



| Springfield Police Department General Order | |
|---|---|
| Subject: Electronic Control Weapons (ECW) | |
| Order Number: G.O. 700.10 | Effective Date: 03/01/2015 |
| Issue Date: 03/01/2015 | Date of Next Review: 03/01/2017 |
| Distribution: All Sworn Officers | Page 1 of 5 |

**I.  Content**

General Guidelines
Policy
Definitions
Procedures
Use of Force Model
Deployment of Device
Medical Care
Reporting

**II.  General Guidelines**

Electronic control weapons, (ECW), often referred to by the common brand name TASER, are electro-muscular disruptors that override the central nervous system. Such weapons provide officers with another control option during situations which require the use of force.

Electronic control weapons will be made available to authorized officers who obtain the training specified by the Commonwealth of Massachusetts, consistent with the policies and recommendations of respected law enforcement agencies, such as the International Association of Chiefs of Police and the Municipal Police Training Committee (MPTC).

**III.  Policy**

It is the policy of this department that electronic control weapons shall be made available as a less lethal use of force option to police officers who are authorized to carry this weapon; and electronic control weapons may be used by authorized and trained personnel in accordance with 501 CMR 8.00, and consistent with additional guidelines established herein.

**IV.  Definitions**

A.  **Electronic control weapon or device:** Also referred to as an electronic weapon. A portable device or weapon from which an electrical current, impulse, wave or beam may be directed where such current, impulse, wave or beam is designed to incapacitate temporarily.

B.  **AFIDS (Anti-Felon Identification Tags):** Confetti-like pieces of paper that are expelled from the cartridge when fired. Each AFID tag contains an alpha-numeric identifier unique to the cartridge used.

C. **Drive Stun Mode**: The electronic control weapon is used without the cartridge. The device is pressed against the subject, and an electrical shock is delivered. Utilized in this method, the electronic control weapon is a pain compliance option and will not cause neuromuscular incapacitation.

D. **Probe Deployment Mode**: Probes are discharged causing a temporary electro-muscular disruption.

E. **Neuromuscular Incapacitation**: Occurs when an electronic control weapon is able to cause involuntary stimulation of both the sensory nerves (nerves that carry information from the body to the brain) and the motor nerves (nerves that carry commands from the brain to the muscles to control movement).

V.   **Procedures**

A. **Authorization**
The department policies regarding Use of Force G.O. 100.20, and Use of Force Reporting G.O. 500.75, apply to electronic weapons. For further information, refer to these policies.

Only officers who have been trained and authorized may carry this device. Except for training purposes, an officer shall not possess or carry an electronic control weapon until successfully completing an approved training program in the use of electronic weapons.

Special Regulation Regarding Electronic control weapons, training:
>   501 CMR 8.04 establishes a training requirement for the use of electronic weapons. In order to qualify for admission into an approved training program for the use of electronic weapons, an authorized officer must:
>   a.  Be currently employed as a state or municipal law enforcement officer;
>   b.  Have  successfully completed a firearms training course conducted by the Municipal Police Training Committee or approved by the Colonel of the Massachusetts State Police; and
>   c.  Be authorized by the officer's department to carry a firearm in the   performance of the officer's duty.

All instructors must be certified by the Municipal Police Training Committee, (MPTC).

All officers authorized to carry an electronic control weapon will be trained using curriculum identical to the MPTC's and includes the following:
>   a.  At least an 8-hour training course.
>   b.  A review of the mechanics of the electronic control weapon.
>   c.  A review of medical issues to be considered with the use of the electronic control weapon including but not limited to, effects of its use on individuals with pre-existing medical conditions and information / demonstration regarding removal of the wires and probes from an individual following the discharge of the electronic control weapon.
>   d.  Weapon proficiency will be demonstrated with an accurate discharge of the electronic control weapon by each trainee.
>   e.  Use of the electronic control weapon as a less lethal force option and its relation to other department authorized weapons, and review of the department's Use of Force policy and any other applicable policies.
>   f.  Officers may periodically be required to re-certify with the use of the electronic control weapon.

B. **Carrying**
The device will be carried in an approved holster in a cross draw configuration on the side of the body opposite the service handgun.  The device will be carried fully armed with the safety on.  Off duty possession of the electric control weapon is not authorized.

C. **Accessories**
Only agency-approved battery power sources shall be used in the electronic weapon.  No unauthorized alterations, modifications or accessories will be used.

## VI. Use of Force Model

A. **Drive Stun Mode**
In drive stun mode the device is a pain compliance tool rather than an electro-muscular disruptor.  It may be deployed as a pain compliance technique in response to an active resistant person.  It is minimally effective compared to conventional cartridge-type deployments. The effect of drive stun is not as long-lasting as fired probes.  Note: Pain compliance may not be effective against someone in a state of "mind-body disconnect," as in a mental health crisis state, under the influence of a mind altering substance, or extremely focused.

B. **Firing the device**
Firing the device cartridge to deploy electrodes is a defensive tactic.  It may be used in response to an assaultive person.

C. **Lethal Force**
Intentionally firing the device at the head or neck is a deadly force countermeasure in response to a lethal threat.  ELECTRONIC CONTROL WEAPONS ARE NOT A SUBSTITUTE FOR LETHAL FORCE. Officers are not expected to respond to a lethal force threat with a less lethal force option such as an electronic weapon.  An electronic control weapon may be used in response to a lethal force threat under exigent circumstances as a weapon of available means.  Electronic control weapons are best considered an option in situations where the officer has moved to a position of advantage such as cover, concealment or barrier, based upon the subject's behavior or weapons; and  an additional officer can safely approach the subject to within effective range to deploy the electronic control weapon.

## VII. Deployment of Device

A full five second cycle deployment should be applied without interruption unless circumstances dictate otherwise.  The five second cycle is a potential "window of opportunity" for an officer to immobilize, control, or handcuff a suspect.   Secure the suspect as quickly as possible during or immediately following the period of capacitation.  A second or subsequent five second cycle may be necessary if, after the first five second cycle, the officer still perceives the subject as a threat.  Officers should be aware that an energized subject may not be able to respond to commands during, or immediately following exposure.  The officer shall energize the subject the least number of times and no longer than necessary to accomplish the legitimate operational objective.

A. **Target Areas**
Preferred Target areas include: back, buttocks, lower abdomen and thighs.  Avoid aiming at the head or neck unless the encounter justifies a deadly force response.

### B. Forbidden

    a. Deployment of the device in a punitive or coercive manner.

    b. Use on a handcuffed or secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion.

    c. Use in any environment where an officer knows that a potentially flammable, volatile, or explosive material is present (including but not limited to OC spray with volatile propellant, gasoline, natural gas, or propane). The Springfield Police department only authorizes the use of OC spray that is non-flammable and specifically formulated for use with electronic control devices.

    d. In any environment where the subject's fall could reasonably result in death (such as in water or on an elevated structure).

### C. Susceptible Populations

Officers should be aware of the greater potential for injury when using an electronic control weapon against certain individuals. Electronic control weapons should not be used against:

    a. children under the age of eighteen (18);

    b. adults over the age of seventy (70);

    c. women believed to be pregnant; or

    d. those known to be suffering from severe mental illness.

    e. those known to have pacemakers

Electronic control weapons should only be deployed on these vulnerable groups if the officer's assessment at the time is that the individuals have or will cause immediate serious bodily harm to themselves and/or others but could be subdued by an electronic weapon.

### D. Probes

Probes may be removed by trained officers after the subject is restrained.

## VIII. Medical Care

### A. Seek medical attention for:

    a. A person who requests medical attention.

    b. A person who does not appear to recover properly after being engaged with the electronic device.

    c. A person who is in a potentially susceptible population category. See SUSCEPTIBLE POPULATION in this policy.

    d. A person who has been energized more than three times.

    e. A person who has had more than one electronic control weapon effectively used against him or her in any given incident.

    f. A person who has been subjected to a continuous energy cycle of fifteen (15) seconds or more.

    g. A person who has exhibited signs of extreme uncontrolled agitation or hyperactivity prior to electronic control weapon exposure. For further information, see the department policy regarding Use of Force.

### B. Transport, by ambulance, the following to a medical facility:

    a. A person who is struck by a probe in the neck, throat, face, female breasts, groin.

    b. A person from whom personnel have difficulty removing the probes.

    c. A case in which the barb separates from the probe upon removal.

IX.     Reporting

A.  **Officer Responsibilities**
The deploying officer shall notify his or her supervisor as soon as possible after deploying the device and shall complete the designated ECW form.

Officers shall specifically articulate in their use-of-force report any instance of the following:
   a.  An electronic control weapon is energized more than three times on a single subject.
   b.  An energy cycle longer than fifteen (15) seconds in duration is used against a subject.
   c.  More than one electronic control weapon is used against a subject in any given incident.
   d.  An electronic control weapon is used against an individual designated to be in a "susceptible population."

B.  **Supervisor Responsibilities**
   a.  Ensure that photographs of the area impacted by the probes are taken after the probes are removed, if possible.  Officers are advised to protect the privacy and confidentiality of the subject.
   b.  Ensure that the subject has received the proper medical attention.
   c.  If the device has been fired, the officer shall collect the cartridge, wire leads, darts, and AFIDs as evidence in a proper container. Darts are to be treated as a biohazard material and appropriately handled and tagged.  These will be held until final disposition of any criminal charges, but not less than 90 days.
   d.  If the device has been discharged, notification will be made to the Police Commissioner as soon as possible through written reporting requirements.

C.  **Administrative Responsibilities**
The Springfield Police Department will comply with all data collection and reporting requirements set forth in MGL chapter 140 section 131j and St. 2004, chapter 170 section 2.

There will be an administrative review of each report of the discharge of an electronic weapon. This will be conducted by the captain assigned to Quality Assurance or other command staff officer as directed by the Police Commissioner.  The department will conduct an annual analysis of reported uses of electronic weapons.   Training needs, equipment upgrades, and/or policy modifications will be considered.


_____
John R. Barbieri, Police Commissioner

# EXHIBIT B

**CERTIFICATE OF VITAL RECORDS**

**VERIFY PRESENCE OF WATERMARK     HOLD TO LIGHT TO VIEW**

# The Commonwealth of Massachusetts

CT 4855596





*Commonwealth of Massachusetts*
*Registry of Vital Records and Statistics*
CERTIFICATE OF DEATH
MEDICAL EXAMINER

19/222

| State File # | 2020-023735 |
| Registered # | 1081 |

OCME CASE # 2020-4479

07012019

| | |
|---|---|
| *Place of Death* | BAYSTATE MEDICAL CENTER, SPRINGFIELD, MA |
| *Date of Death* | APRIL 03, 2020    *Age* 45 YRS    *Sex* MALE |
| *Current Name* | CHEST , STERLING LESTER |
| *Surname at Birth or adoption* | CHEST    *SSN* 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 |
| *AKA* | ---- |
| *Date of Birth* | OCTOBER 15, 1974    *Birthplace* NEW ORLEANS, LOUISIANA |
| *Residence* | 84 SHAMROCK STREET, SPRINGFIELD, MASSACHUSETTS 01108 |
| *Race* | BLACK    *Education* BACHELOR'S DEGREE |
| *Marital Status* | DIVORCED    *Occupation/Industry* CNA/HEALTH AGENCY |
| *Last Spouse – Last, First, Middle (Surname at Birth or Adoption)* | CHEST, ERICA (SANTIAGO)    *Decedent: U.S. Veteran (Most Recent)* NO |
| *Parent Name – Last, First Middle (Surname at Birth or Adoption)* | CHARLES, LITTIE (CHEST)    *Birthplace* LOUISIANA |
| *Parent Name – Last, First, Middle (Surname at Birth or Adoption)* | CHARLES SR, STERLING LESTER (CHARLES)    *Birthplace* LOUISIANA |

*Part I. Cause of Death – Sequentially list immediate cause then antecedent causes then underlying cause*    *Interval between onset and death*

a. *Immediate Cause (Final condition resulting in death)*
CARDIAC TAMPONADE DUE TO RUPTURED MYOCARDIAL INFARCTION FOLLOWING    ----

b. *Due to or as a consequence of:*
PHYSICAL ALTERCATION WITH POLICE INCLUDING ELECTROMECHANICAL SHOCK    ----

c. *Due to or as a consequence of:*
AND RESTRAINTS FOR THE MANAGEMENT OF AN ACUTE PSYCHOTIC EPISODE    UNKNOWN ----

d. *Due to or as a consequence of:*

*Part II. Other significant conditions contributing to death but not resulting in underlying cause*
HYPERTENSIVE CARDIOVASCULAR DISEASE, DIABETES MELLITUS

| *Manner of Death:* | COULD NOT BE DETERMINED |
| *Time of Death:* | 08:35 AM |
| *Result of Injury:* | NO |

*Certifier* CHRISTOPHER PERRY, MD    *Lic #* 274670

*Addr.* 720 ALBANY STREET, BOSTON, MASSACHUSETTS 02118

*Funeral Licensee/Designee* PAULETTE J. HENDERSON    *Lic #* 6363

*Facility/Addr.* HENDERSON FUNERAL HOME, INC., SPRINGFIELD, MASSACHUSETTS

*Immediate Disposition* CREMATION

*Date of Immediate Disposition* APRIL 29, 2020

*Place/Address*
HILLCREST PARK CEMETERY ASSOCIATION, 895
PARKER STREET, SPRINGFIELD, MASSACHUSETTS 01129

*Date of Record*    APRIL 29, 2020

*Date of Amendment*    APRIL 16, 2021

CLERK, CITY OF SPRINGFIELD

*DATE ISSUED:    JANUARY 03, 2022*

I, the undersigned, hereby certify that I am the Clerk of the City of Springfield; that as such I have custody of the
records of birth, marriage, and death required by law to be kept in my office; and I do hereby certify that the above
is a true copy from said records, as held in the Commonwealth's central vital records information repository.

*Clerk*
*City of Springfield*

R-301 p. 2 of 2          CHEST                             SFN: 2020 023735

SPRINGFIELD 1081 DEPOSITION # ---         AMENDED: APRIL 16, 2021

SPRINGFIELD

STATE VOL/P G: 19/222 OPEN

| *If U.S. war veteran, specify war/conflict(s)* | | | |
|---|---|---|---|
| --- | | | --- |
| *Branch of military (most recent)* | | *Rank/organization/outfit (most recent)* | |
| --- | | --- | |
| *Date entered (most recent)* | *Date Discharged (most recent)* | *Service Number (most recent)* | |
| --- | --- | --- | |
| *Place of Death Type* | | *Date of Pronouncement* | *Time of Pronouncement* |
| HOSPITAL - INPATIENT | | --- | --- |
| *RN/NP/PA Pronouncement?* | *Name of RN/NP/PA Pronouncing Death* | | *Lic #* |
| NO | --- | | --- |
| *RN/NP/PA Employing Agency or Institution* | | *Name of Physician or Medical Examiner notified* | |
| --- | | --- | |
| *Was M.E. Notified?* | *Provider in charge of patient's care, if not certifier* | | |
| YES | | | |
| *Autopsy Performed?* | *Findings available for Cause?* | *Tobacco contribute to death?* | *Pregnancy Status, if female* |
| YES | YES | UNKNOWN | --- |
| *Date of Injury* | *Time of Injury* | *Injury at Work?* | *If Transportation Injury, specify:* |
| --- | --- | --- | --- |
| *Place of Injury* | | *Location/Address of Injury:* | |
| | | --- | |
| *Describe How Injury Occurred* | | | |
| --- | | | |
| *Expanded Race:* BLACK | | | |
| *Ethnicity:* AFRICAN AMERICAN | | | |
| *Informant Name* | | | *Relationship* |
| KEELY CHARLES | | | SISTER |
| *Addr.* 6 ROSEMONT STREET, SPRINGFIELD, MASSACHUSETTS 01108 | | | |
| *Date Disposition Permit Issued:*  APRIL 28, 2020 | | *Board of Health Agent*  HELEN CAULTON-HARRIS | |
| *State Tracking No.*    023735 | | *Local Permit No.*  S20-023735 | |

EVIDENCE:      MEDICAL EXAMINER UPDATE

THIS DOCUMENT IS PRINTED ON SECURITY WATERMARKED PAPER AND CONTAINS SECURITY FIBERS.
DO NOT ACCEPT WITHOUT VERIFYING THE PRESENCE OF THE WATERMARK.

THE DOCUMENT FACE CONTAINS A SECURITY BACKGROUND AND EMBOSSED SEAL. THE BACK CONTAINS
SPECIAL LINES WITH TEXT.