UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KEELY CHARLES, as Personal Representative of          *
the Estate of Sterling Lester Chest,                 *
                                                     *
          Plaintiff,                                 *
                                                     *
     v.                                              *
                                                     *   Civil Action No. 23-30034-MGM
CITY OF SPRINGFIELD, JOSEPH                          *
BELIVEAU, LINDSAY TAGLIAPIETRA,                     *
LUIS DELGADO, and KRISTOPHER                         *
CARR,                                                *
                                                     *
                                                     *
          Defendants.                                *

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 51)

March 24, 2026

MASTROIANNI, U.S.D.J.

I. INTRODUCTION

Plaintiff Keely Charles, as Personal Representative of the Estate of Sterling Lester Chest

("Decedent"), brings this action against the City of Springfield and Springfield police officers Joseph

Beliveau, Lindsay Tagliapietra, Luis Delgado, and Kristopher Carr. Plaintiff's claims arise out of an

encounter during which Decedent was experiencing a mental health episode and the defendant

officers responded to assist in an emergency commitment under Mass. Gen. Laws ch. 123, § 12.

After Decedent suddenly pushed Beliveau and continued advancing on him, Beliveau deployed his

taser. The officers then handcuffed Decedent and brought him to a police cruiser, where the officers

struggled to force him inside the cruiser and Carr ultimately kneed Decedent and pushed him inside.

Decedent was then brought to a hospital, treated for his injuries, and discharged after three days, but he returned the following day complaining of chest pain and tragically died.

Defendants seek summary judgment on Plaintiff's remaining Fourth Amendment excessive force and Americans with Disability Act ("ADA") claims. The court concludes that summary judgment is warranted as to the ADA claim and for the portions of the excessive force claims based on the tasing of Decedent and moving Decedent from the sidewalk to the police cruiser shortly after the tasing. However, the court denies summary judgment as to the portions of the excessive force claims based on the extended struggle at the police cruiser to place Decedent inside the vehicle, including the knee strike performed by Carr and the use of a baton by Tagliapietra.

## II. BACKGROUND

The following facts are undisputed and derive from the discovery record, including unchallenged video footage with no audio which captures most of the encounter with the defendant officers. *See O'Brien v. Town of Bellingham*, 943 F.3d 514, 531 (1st Cir. 2019) ("When the record contains video evidence, the authenticity of which is not challenged, the court should ordinarily view the facts 'in the light depicted by the video evidence.'" (quoting *Underwood v. Barrett*, 924 F.3d 19, 20 (1st Cir. 2019)).

On March 30, 2020, after approximately two weeks of experiencing increasing paranoia about the COVID-19 pandemic and making statements regarding demons and God, Decedent -- who was 6'3" tall and weighed over 440 pounds -- abruptly left his home in Springfield. His girlfriend, Jessica Reyes, followed Decedent in a vehicle and eventually convinced him to sit inside her car. Meanwhile, Ms. Reyes had called a Behavioral Health Network crisis team, and Ms. Reyes's mother, Margarita Torres, had called the Springfield police dispatch to request assistance. Ms. Torres informed dispatch that Decedent "went crazy about the coronavirus" and was "running up and down the street" and "talking about the Bible"; Ms. Torres also stated Decedent was not violent and

2

was not under the influence of drugs. (Dkt. No. 54-9.) Springfield police dispatch requested an ambulance to respond to Decedent's psychiatric episode. Springfield Police Officer Luis Delgado "was dispatched to [the] psychiatric call to assist" the EMTs. (Dkt. No. 54-5 at 2.) Delgado arrived at the scene at approximately 5:07 p.m., along with a state police trooper, and found Decedent sitting in the front passenger seat of Ms. Reyes's vehicle. By 5:08 p.m., dispatch notified the officers that an emergency commitment under Mass. Gen. Laws ch. 123 § 12 had been issued for Decedent and that an ambulance was en route.

Delgado initially spoke with Decedent through the passenger-side window of the vehicle, before Decedent exited (upon Delgado's request) to get pat-frisked. Then, Springfield Police Officers Lindsay Tagliapietra and Joseph Beliveau arrived, and Decedent spoke with the three Springfield officers for several minutes standing outside the car in what appeared to be a relatively calm demeanor. The Springfield officers testified at their depositions that Decedent made bizarre religious statements, including that he had "read too far into the Bible." (Dkt. No. 54-8 at 3.) At 5:11 p.m., Tagliapietra retrieved Decedent's water jug from Reyes's vehicle for him and Decedent shook Tagliapietra's hand. The officers informed Decedent they were not there to arrest him but were waiting for the ambulance. After approaching and asking each officer individually whether they had given themselves "to the Lord," Decedent re-entered the passenger seat of Reyes's vehicle at 5:13 p.m. (Dkt. No. 72-8 at 5; *see also* Dkt. No. 72-3 at 5.) The officers waited outside the vehicle, while Decedent sat inside.

At 5:16 p.m., Decedent exited the vehicle and dropped his water jug, but then suddenly and aggressively approached Beliveau with outstretched arms and forcefully shoved him. Beliveau stumbled backwards as Decedent immediately advanced on him with increased speed in a continued aggressive manner. Beliveau unholstered and aimed his department-issued taser at Decedent, who swung his arm and moved in a way to grab or strike the taser. Beliveau then fired his taser at

3

Decedent in probe mode[1] within seconds of Decedent's shove and continuing advancement. On a second firing (also in probe mode), Beliveau's taser probes struck Decedent in the hand and delivered an electrical charge, which caused Decedent to collapse to the ground.[2] All four officers then, without the use of any unnecessary force, repositioned Decedent onto his stomach, handcuffed him, and brought him to a seated position on the sidewalk.

The officers then made a group decision to bring Decedent to his feet and walk him to a police cruiser. At 5:18 p.m., Decedent began walking with the officers in what appears to be an agreeable way, but about halfway to the cruiser Decedent started resisting. The officers regained control and Decedent spat in Delgado's face, before they resumed walking. Once at the cruiser, Decedent struck his own head three times against the exterior rear passenger window. Beliveau opened the rear passenger cruiser door, and Beliveau, Delgado, and Tagliapietra tried to force Decedent inside the vehicle, but Decedent's pants had fallen down and he dropped to his knees. Delgado and Beliveau then lifted Decedent to his feet and, with Tagliapietra, attempted to force Decedent into the back of the cruiser by pushing, ramming, pulling, and lifting different parts of his body, but with no success.

During this struggle, in which Decedent appears not to be actively resisting but not helping the officers, Tagliapietra tried to pull Decedent into the vehicle from the driver's-side back seat by using her "baton to get it between the handcuffs and [Decedent's] back in order to use it as leverage." (Dkt. No. 72-6 at 9.) By 5:22 p.m., the struggle was at an impasse, with Decedent still standing outside the cruiser. At 5:23 p.m., Springfield Police Officer Kristopher Carr arrived at the

---

[1] "Tasers generally have two modes": probe (or dart) mode, and drive stun mode. *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 897 (4th Cir. 2016). In probe mode, "a taser shoots probes into a subject and overrides the central nervous system. . . . Drive stun mode, on the other hand, does not cause an override of the victim's central nervous system; that mode is used as a pain compliance tool with limited threat reduction." *Id.* (internal quotation marks omitted); *see also Gray v. Cummings*, 917 F.3d 1, 6 n.2 (1st Cir. 2019); *Parker v. Gerrish*, 547 F.3d 1, 6 (1st Cir. 2008).

[2] Tagliapietra, who was positioned behind Decedent, also pulled out her taser in response but did not deploy it.

scene. Carr quickly walked from the rear driver's side to the rear passenger side of the cruiser, where Decedent was standing with Delgado and the state trooper; Carr then took two steps back and accelerated forward, forcefully kneeing Decedent in his groin or stomach area, and grabbed his head to push his body inside the vehicle. Carr then lifted Decedent's legs, while Tagliapietra and another officer pulled his body further inside the cruiser from the other side.

Approximately 30 seconds after the officers closed the back-seat doors to the cruiser, an ambulance arrived on the scene. A social worker from Behavior Health Network was also at the scene, and she provided the emergency commitment order under Mass. Gen. Laws ch. 123 § 12 to the EMTs. Tagliapietra transported Decedent to the hospital in her cruiser. Decedent's aggressive behavior apparently returned, as hospital notes state that Decedent "required four point-restraints, spit mask and 10mg Haldol, 4 mg Ativan on arrival to ED," as well as "200 mg ketamine" on reexamination "[d]ue to extreme agitation." (Dkt. No. 54-13 at 3.) Hospital notes also include diagnoses of "[a]cute psychosis," "severe agitation," "[a]vulsion fracture left elbow," and "rhabdomyolysis." (*Id.* at 5.) Decedent was discharged on April 2, 2020, but on April 3, 2020, he returned to the hospital with chest pain and died.

### III. STANDARD OF REVIEW

"The function of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Thus, "a nonmovant can forestall summary judgment by 'present[ing] definite, competent evidence' demonstrating the existence of a genuine dispute about a material fact." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st

Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law,'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). At summary judgment, "the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018). But the court may not evaluate the credibility of witnesses or weigh the evidence, as those questions are reserved for the jury. *Id.*; *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).

## IV. ANALYSIS

### A. Excessive Force Claims

Defendants argue the individual officers are entitled to qualified immunity on the excessive force claims. "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (quoting *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021)). "Under the familiar two-prong framework, courts ask (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was 'clearly established' at the time of the alleged violation." *Id.* (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018). Courts "further break down the second [prong] by asking whether (a) there is controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm; and (b) an objectively reasonable officer would have known that his conduct violated the clearly established law in the circumstances he faced." *Conlon v. Scaltreto*, 158 F.4th 211, 219 (1st Cir. 2025) (internal quotation marks omitted). Although Plaintiff faces a "heavy burden" in seeking to overcome

6

qualified immunity, *Bannon v. Godwin*, 99 F.4th 63, 84 (1st Cir. 2024) (internal quotation marks omitted), courts "are not limited to the cases cited by the parties," *Heredia v. Roscoe*, 125 F.4th 34, 47 n.11 (1st Cir. 2025). Instead, "[i]n conducting a qualified immunity analysis, a court should use its full knowledge of its own [and other relevant] precedents." *Wadsworth v. Nguyen*, 129 F.4th 38, 59 n.12 (1st Cir. 2025) (quoting *Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011)).

As to the first prong, "[e]xcessive force claims are founded on the Fourth Amendment right to be free from unreasonable seizures of the person." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010). "The Fourth Amendment is implicated where an officer exceeds the bounds of reasonable force in effecting an arrest or investigatory stop." *Id.* In addition, "the Fourth Amendment's protections against unreasonable searches and seizures apply to the involuntary hospitalization of persons for psychiatric reasons." *Ahern v. ODonnell*, 109 F.3d 809, 815 (1st Cir. 1997).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *O'Brien*, 943 F.3d at 530 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Reasonableness is assessed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' . . . and must take account of 'the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'" *Bannon*, 99 F.4th at 78 (quoting *Graham*, 490 U.S. at 396-97). Accordingly, "[d]etermining whether a particular use of force is reasonable requires consideration of the totality of the circumstances," which "entails the weighing of a myriad of factors such as 'the severity of the crimes at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] was actively resisting arrest or attempting to evade arrest by flight.'" *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir.

7

2019) (quoting *Graham*, 490 U.S. at 396). Additional factors include "[w]hether a warning was given before the use of force and whether the suspect complied with this command," "[w]hether the suspect was armed . . . at the time of the encounter or whether the officers believed the suspect to be armed," "[t]he speed with which officers had to respond to unfolding events," "[w]hether the suspect was advancing on the officers or otherwise escalating the situation," and "[t]he suspect's physical proximity to the officers at the time of the use of force." *Bannon*, 99 F.4th at 78 (internal quotation marks and citations omitted). The First Circuit has also explained that "a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate," since "the level of force that is constitutionally permissible in dealing with a mentally ill person differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community." *Gray*, 917 F.3d at 11 (internal quotation marks omitted).

The First Circuit favors "a segmented approach in reviewing use of force claims when appropriate, particularly when the circumstances between uses of force change." *Heredia*, 125 F.4th at 45. Here, it is clear the circumstances between uses of force changed during the encounter, *see Lachance v. Town of Charlton*, 990 F.3d 14, 26 (1st Cir. 2021), and there are four portions of the encounter in which Plaintiff asserts the officers used excessive force: (1) the tasing; (2) moving Decedent from a seated position at the sidewalk to the cruiser; (3) the struggle at the cruiser; and (4) the knee strike performed by Carr. The court concludes qualified immunity bars Plaintiff's first two theories but not the second two.

Assuming Plaintiff could establish a constitutional violation as to Beliveau's tasing of Decedent, the court concludes "the law in this area was not sufficiently clear that every reasonable official would understand that" tasing him at that moment would be unlawful. *Segrain v. Duffy*, 118 F.4th 45, 69 (1st Cir. 2024) (quoting *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). The record shows that

Decedent, a man who was significantly larger than the officers, suddenly and unexpectedly attacked Beliveau by shoving him with both hands and then quickly continued to advance on him in an aggressive manner. Decedent also appeared to react to Beliveau's unholstering and aiming of the taser by trying to knock it out of Beliveau's hand or by grabbing it. The incident occurred very quickly and unexpectedly, with Decedent and Beliveau moving in a direction that caused the other officers to be out of position to restrain or prevent Decedent's advancement, and which put Beliveau within his reach, before the taser was deployed. Beliveau had only a split-second to assess the danger to himself and decide how to react. *See Bannon*, 99 F.4th at 78; *see also McGrath v. Tavares*, 757 F.3d 20, 28 (1st Cir. 2014) ("This is the type of 'split-second judgment' police officers are forced to make, and which we must take into account is assessing an officer's actions."). The immediate safety threat to Beliveau, the speed with which he had to respond, the size disparity, and Decedent's physical proximity to and unyielding advancement on Beliveau all support a serious use of force, such as a taser, in order to mitigate the clear danger posed by Decedent in that moment. *See, e.g.*, *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 905 (4th Cir. 2016) ("[A] police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force.").

Granted, not all of the relevant factors favor Beliveau. For example, the officers outnumbered Decedent four-to-one, Decedent was unarmed, and Beliveau did not give a warning prior to using the taser.[3] Moreover, the police were dealing with a mentally ill individual, rather than a criminal suspect. *See id.* at 900; *Gray*, 917 F.3d at 11. Still, given the fast-moving nature of the situation at this point, and the absence of case law establishing that this level of force is

---

[3] But Decedent saw the taser and recognized its general purpose, causing him to try to grab or knock it away so as to continue with his violent advance on Beliveau.

inappropriate under the circumstances, qualified immunity applies and bars liability for Beliveau's use of the taser.

Plaintiff also argues the officers should not have moved Decedent from the seated position at the sidewalk to the police cruiser, given that an ambulance was on its way and Decedent was secured in that location. But the decision to move Decedent was not an excessive use of force, and there was very little force used by the officers to guide the direction of Decedent during the walk. *See Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 327 (1st Cir. 2015) ("[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (quoting *Graham*, 490 U.S. at 396)). While in retrospect it might have been preferrable to leave Decedent in the seated position on the sidewalk, the officers did not know exactly when the ambulance would arrive. In addition, Decedent was behaving irrationally and displayed how he was prone to unexpected outbursts. It is reasonable to assume that an extended wait on the sidewalk (where members of the public could and did move about) presented its own safety risks compared to securing Decedent in the cruiser. Accordingly, the court concludes that neither the decision to move Decedent nor the minimal force used during the walk violated the Fourth Amendment under the first prong.

The court, however, reaches a different conclusion as to the remainder of the encounter at the police cruiser. Once at the cruiser, and especially after Decedent's pants fell down, he was essentially immobilized. Unlike the tasing, at this point in the encounter there was no immediate danger and no need for split-second decision making. *See Stamps v. Town of Framingham*, 813 F.3d 27, 41 (1st Cir. 2016); *see also Gray*, 917 F.3d at 9. Rather, viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, a reasonable jury could find the situation at the cruiser was a "static impasse," with Decedent not assisting the officers get him into the cruiser but also not actively resisting or posing any safety risk. *Estate of Armstrong*, 810 F.3d at 902; *see also id.*

at 906. A reasonable jury could also find there were moments during this struggle when Decedent attempted to enter the cruiser but could not physically comply because the pants around his legs hindered his full movement.

In addition to the forceful shoving and ramming of Decedent on the passenger side of the cruiser, Tagliapietra -- in the rear driver's side and largely out of the camera's view -- used her baton as leverage to pull Decedent's handcuffed arms and wrists behind his body. Tagliapietra testified at her deposition that she was never trained on this technique and had never used it before; rather, "[i]t was just an idea that [she] [came] up with." (Dkt. No. 72-6 at 17.) Plaintiff's police expert, Mr. Mancini, testified at his deposition that "the baton should be used only as trained" and not in the manner Tagliapietra used it. (Dkt. No. 57-5 at 71.) In addition, the autopsy report notes the skin on decedent's wrists "reveal[ed] hemorrhage of the soft tissues" as well as "a 5.0 x 2.5 centimeter indentation." (Dkt. No. 72-9 at 6.) A reasonable jury viewing the evidence in the light most favorable to Plaintiff could infer that those injuries were caused by Tagliapietra's use of the baton in pulling Decedent into the cruiser and that other injuries were caused by the officers' repeated forceful contact with his body at the cruiser. *Cf. Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 72 (1st Cir. 2016) (explaining that "specific causation is not necessary to determine whether there was a constitutional violation," and the defendant "could still be liable for using excessive force if [the decedent] had not died or if his death was caused only by cocaine intoxication"). Given the lack of safety or flight risk, the time available to deliberate, and the context of a mentally ill individual in need of hospitalization, the governmental interest in using injurious force at this juncture was very low. *See Estate of Armstrong*, 810 F.3d at 901 ("Where a seizure's sole justification is preventing harm to the subject of the seizure, the government has little interest in using force to effect that seizure.").

The same is true as to Carr's knee strike, which courts generally consider to be "an intermediate level of force." *Barror v. City of Saint Helens*, 2024 WL 1158336, at *6 (D. Or. Mar. 18,

2024); *see also Matusak v. Daminski*, 165 F.4th 702, 715 (2d Cir. 2026) ("[A]ny reasonable police officer would know that fist and knee strikes to a suspect's abdomen also constitute significant force."). When Carr arrived on the scene, the situation was essentially a static impasse, with Decedent standing against the cruiser, handcuffed, and his pants down, surrounded by multiple officers who were holding him in place. *See Estate of Armstrong*, 810 F.3d at 906 ("A reasonable officer would have perceived a static stalemate with few, if any, exigencies . . . ."); *see also Gray*, 917 F.3d at 9 ("[A] jury could supportably find that . . . Gray had been subdued to a point at which she no longer posed a threat."). Carr, however, immediately escalated the use of force by performing the knee strike without any warning to Decedent or the other officers. A jury could easily find that "an 'objectively reasonable police officer' would have taken a more measured approach." *Ciolino v. Gikas*, 861 F.3d 296, 304 (1st Cir. 2017) (quoting *Raiche*, 623 F.3d at 39); *see also Heredia*, 125 F.4th at 45-46. The court therefore concludes that Plaintiff "has presented sufficient evidence to make out a jury question as to whether [Carr, Tagliapietra, Beliveau and Delgado] used excessive force" at the police cruiser. *Gray*, 917 F.3d at 9.

The court also concludes that the second qualified immunity prong is satisfied on these facts. Although "the clearly established law employed in a qualified immunity analysis must be particularized to the facts of the case" and courts "should not over-rely on precedents that are cast at a high level of generality," "there need not be a case directly on point to satisfy the second [prong] of the qualified immunity paradigm." *McKenney v. Mangino*, 873 F.3d 75, 82-83 (1st Cir. 2017) (internal quotation marks omitted). At bottom, courts look to "whether precedents existing at the time of the incident establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule." *Id.* at 83 (internal quotation marks omitted).

Since 2019, it has been clearly established in the First Circuit that "a subject's mental illness is a factor that a police officer must take into account in determining what degree of force, if any, is appropriate," and the level of "constitutionally permissible" force used against such individuals differs substantially from that which may be used against a criminal suspect. *Gary*, 917 F.3d at 11 (internal quotation marks omitted). Defendants argue *Gray* could not have provided sufficient guidance to the officers because the First Circuit in that case only "assumed a constitutional violation arguendo" and "[a]ssuming a constitutional harm for purposes of analysis does not create a new constitutional obligation." (Dkt. No. 75 at 13.) But the First Circuit explicitly did hold in *Gray* that the plaintiff "has presented sufficient evidence to make out a jury question as to whether [the defendant] used excessive force." *Id.* at 9. That holding provides adequate notice to law enforcement officials, for purposes of the second qualified immunity prong, regarding the appropriate use of force against a mentally ill individual who resists a seizure. *See id.* at 20 (concluding that "our ruling today . . . establishes in this circuit that a jury could supportably find the use of a Taser to quell a nonviolent, mentally ill person who is resisting arrest to be excessive force"); *see also Estate of Armstrong*, 810 F.3d at 909-10 (explaining that although qualified immunity barred liability, the court's analysis finding constitutionally excessive force provides clarity to officers going forward).

Defendants are mistaken in arguing the facts in *Estate of Armstrong*, 810 F.3d 892, support their position. According to Defendants, "[t]he Armstrong court emphasized that the subject there was sitting down in a stationary position for *thirty minutes* without creating exigency," whereas here there "was a dynamic, evolving threat requiring continuous force to resolve—the polar opposite of Armstrong's static scenario." (Dkt. No. 52 at 16 (emphasis added) (internal quotation marks omitted); *see also id.* at 19.) But the facts in *Estate of Armstrong* actually undermine Defendant's position and support Plaintiff's claims for excessive force at the police cruiser. The Fourth Circuit in *Estate of Armstrong* explained that the decedent "was refusing to let go of the post he had wrapped

13

himself around despite verbal instruction to desist and a brief -- *30 second* -- attempt to physically pull

him off." *Id.* at 901. The Fourth Circuit continued: "That Armstrong was not allowing his arms to

be pulled from the post and was refusing to comply with shouted orders to let go, while cause for

some concern, do not import much danger or urgency into a situation that was, in effect, a static

impasse." *Id.* at 901-02. Later in the opinion, the Fourth Circuit again explained that the static

impasse arose after just 30 seconds of noncompliance (rather than the 30 minutes asserted by

Defendants):

> Under these facts, when Officer Gatlin deployed his taser, Armstong was a mentally ill man being seized for his own protection, was seated on the ground, was hugging a post to ensure his immobility, was surrounded by three police officers and two hospital security guards, and had failed to submit to a lawful seizure for only 30 seconds. A reasonable officer would have perceived a static stalemate with few, if any, exigencies—not an immediate danger so severe that the office must beget the exact harm the seizure was intended to avoid.

*Id.* at 906; *see also id* ("By the time Appellees chose to inflict force, any threat had sunk to its nadir . . .

."). Similarly, here, a reasonable officer would have perceived a "static stalemate" without

appreciable exigencies after the several-minute-long unsuccessful attempt to force Decedent into the

cruiser, given that he was handcuffed, surrounded by officers at the side of the cruiser, and

positioned such that he could not flee or injure any officers (or even himself). Contrary to

Defendants' argument, *Estate of Armstrong* provides sufficient guidance that when, after an elapsed

period of time, a mentally ill individual presents "little risk" because he is "stationary, non-violent,

and surrounded,"—*i.e.*, the situation is at a static impasse or stalemate—police are not justified in

using injurious force. *Id.*

In addition, a jury could supportably find the defendant officers knew they were responding

to a mental health episode to assist in a hospitalization and, at the cruiser, they "had adequate time

to determine that there was no reasonable threat posed by [Decedent] and to calibrate [their] use of

force accordingly." *Stamps*, 813 F.3d at 41. Therefore, drawing all reasonable inferences in Plaintiff's

14

favor, the court concludes a reasonable officer in this situation would have known that the force used at the cruiser was disproportionate. *See Heredia*, 125 F.4th at 48 (citing First Circuit cases from 2017, 2010, 2009, and 2008); *Ciolino*, 861 F.3d at 304.

### B.   ADA Claim

Lastly, the court grants summary judgment as to the ADA claim. Plaintiff's ADA claim is brought only against the City of Springfield. But, as Defendants argue, the city "cannot be held vicariously liable" for its officers' actions under Title II of the ADA. (Dkt. No. 75 at 20 (citing *Conlon*, 158 F.4th at 225-26).) The First Circuit has explained that "the municipality itself cannot be held vicariously liable" for the actions of "individual line officers," although it assumed without deciding that an ADA claim could be "brought against relatively high-level officers of the City," such as captains in the police department. *Conlon*, 158 F.4th at 225. Here, the record shows that all of the individual officers were "line officers," rather than "high-level" officers like captains. In addition, Plaintiff has not shown that the city's "existing policies caused a failure to adequately respond to a pattern of past occurrences of injuries like [Decedent's]." *Gray*, 917 F.3d at 19. Nor has Plaintiff presented sufficient evidence that the officers responded as they did based on discriminatory animus or deliberate indifference to Decedent's ADA rights or failed to offer a reasonable accommodation or access to the city's services. *See Conlon*, 158 F.4th at 226; *Gray*, 917 F.3d at 18. Accordingly, Plaintiff's ADA claim fails as a matter of law.

### V. CONCLUSION

For these reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment. (Dkt. No. 51.) Specifically, the court grants Defendants' motion as to the ADA claim (Count VIII) and as to the portions of the excessive force claims (Counts I, II, and III) based on the tasing and the move of Decedent from the sidewalk to the police cruiser. However, the court denies Defendants' motion for summary judgment as to the portions of the

excessive force claims (Counts I, II, III, and IV) based on the struggle at the police cruiser to place Decedent inside the vehicle, including the knee strike performed by Carr and the use of a baton by Tagliapietra.

It is So Ordered.

 /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge